ISAAC C. BROWN ET AL.

V.

ISAIAH THOMAS.

1. CONTRACT—LIEN—ESTOPPEL.—Appellee agreed to furnish A with merchandise, and A promised that appellee should be paid the first money received from A's crop. There was no contract whatever that appellee should have a lien upon or any interest in the crop. Subsequently, appel-

Brown et al. v. Thomas.

lant Brown leased the farm to A, who was his son-in-law, and furnished him the necessary expenses to carry on the farm. *Held*, that appellant could secure himself upon the crop for such advances by provisions in the lease, if made in good faith, or by pledge or mortgage subsequently made, for the arrangement between appellee and A would not deprive appellant of the right to secure payment of his advances, if by the use of greater diligence he could procure the first lien. And the fact that, after appellant leased the premises, he gave appellee an assurance or verbal guaranty that appellee should be paid, would not work an estoppel *in pais*.

2. INSTRUCTIONS—BILL OF SALE—POSSESSION.—The third instruction is misleading, in that the plain inference to be drawn from it is, that although there may have been no delivery of the corn under the bill of sale to appellee, yet as to all persons except subsequent purchasers the title would pass. If appellant, at the time of the execution of the bill of sale to appellee, was in possession of the property by a valid pledge or under a chattel mortgage, although it had neither been acknowledged nor recorded, and continued in such possession after the making of said bill of sale, he could not be regarded as a subsequent purchaser, and yet his lien would be protected by his possession. The instruction, therefore, fails to make a proper exception as to appellant, if he occupied either of the positions indicated.

APPEAL from the Circuit Court of Logan county; the Hon. C. EPLER, Judge, presiding. Opinion filed February 5, 1884.

Mr. M. D. BEECHER and Messrs. BLINN & HOBLIT, for appellant; as to estoppel *in pais*, cited The People v. Brown, 67 Ill. 435; Bigelow on Estoppel, 60; Hefner v. Vandolah, 57 Ill. 520.

Messrs. BEACH & HODNETT, for appellee; cited Simpson v. Pearson, 31 Ind. 1; Horn v. Cole, 51 N. H. 287.

McCULLOCH, P. J. On the first day of January, 1882, appellant, Isaac C. Brown, leased certain premises to his son-in-law, David B. Yale, for farming purposes, to hold for the term of one year from that date; said Yale as rent for the same, was to deliver to said Brown, in the crib, one half of all the corn grown on the land and one half of all other crops. It was further stipulated in said lease that no part of said crops should be sold or removed from the said premises until the rents and all moneys advanced or loaned, or sureties given or paid by said Brown for the use of said Yale, should be paid,

and that the lessee should deliver up the premises to the lessor at the end of the term.

It appears from the evidence that Yale was a man of very little means pecuniarily, and that prior to the leasing of the said land, and in anticipation thereof, he had made application to appellee for credit in his store for goods to be paid for after he should have raised his crop. In pursuance of the arrangement then made, appellee sold goods to Yale to the amount of $435.

When the crop had matured it was put into the cribs belonging to Brown, on the same farm, but not on the same ground leased to Yale, after which a measurement and estimate of the number of bushels of corn raised on the land was had between Brown and Yale, but no division of the corn was actually made. Nor does the evidence show clearly that there was any other agreement between them than that contained in the lease, that the grain so placed in the cribs should be held by Brown in pledge for the payment of money advanced to Yale as provided for in the lease.

On the 16th day of January, 1883, said Yale executed to appellee a bill of sale, in substance as follows:

"I have this day sold and delivered to Isaiah Thomas, one crib of corn containing fifteen hundred and eighty bushels, more or less; the exact amount of bushels is to be determined when the corn is shelled and weighed. The crib containing said corn is the north plank crib, and is situated near the south west corner of the north west quarter of section thirty-one (31), town twenty-two (22), range four (4) west, county of Logan, State of Illinois, on the farm and near the residence of Isaac C. Brown. The said Isaiah Thomas is to pay the said David B. Yale forty-five cents per bushel for said corn as follows: Four hundred and thirty-five dollars on merchandise account due said Thomas from said Yale, and the balance when said corn is shelled and weighed." At the same time there was an understanding between Yale and Thomas that the latter was not to haul the corn until the May following. In the meantime by permission of Thomas, Yale took one hundred and fifty bushels of said corn and with it went to Dakota to reside.

There is some evidence tending to show that when Brown learned of this bill of sale to Thomas, he undertook to fore-close a chattel mortgage which Yale had given him on the corn, and for this purpose nominally placed one William Caruthers in possession, who advertised the same for sale under the chattel mortgage.

At this stage of the business, appellee sued out the writ of replevin in this case against Brown and Caruthers for the corn in the north plank crib, as described in the bill of sale, under which writ the corn was seized.

On the trial of the case it was contended that appellant Brown had given appellee such assurances, during the time the latter was furnishing goods to Yale, that he should receive his pay for the same out of the crop, as to estop Brown from setting up a superior title thereto to that of appellee.

The court at the request of appellee gave to the jury the following among other instructions:

First. If you believe from the evidence that the defendant, Brown, and his son-in-law, Yale, agreed that the crop raised by Yale in 1882 should pay the plaintiff for the provisions that he, Yale, should get from the plaintiff while he was raising the crop, and that Yale so informed the plaintiff, and that plaintiff thereupon went and saw Brown, and that Brown, either directly or indirectly, intentionally induced the plaintiff to believe that such was the agreement, with a view of getting plaintiff to furnish Yale the provisions, and that by reason of such inducements plaintiff advanced the provisions to Yale, then you are instructed that Brown could not be heard to say that he was not to be paid out of such crop for such provisions; and if in pursuance of such agreement, said Yale, by written bill of sale, sold and delivered the corn in controversy to the plaintiff in payment of said debt for provisions, and that thereafter the defendants took possession of such corn, claiming the same under a chattel mortgage and advertised the same for sale, and that thereupon the plaintiff brought this suit, then you should find the issues for the plaintiff.

There are two fatal objections to this instruction, according to

our understanding of the testimony; first, in that it does not appear that any agreement existed between Brown and Yale on the one part, and appellee of the other, that the crop raised by Yale in 1882 should pay appellee for the provisions Yale should get from him while raising the crop. Secondly, the evidence is not sufficient to create an estoppel against Brown claiming the corn.

The evidence upon which this instruction was predicated is substantially as follows: Appellee testified: I had an arrangement with Mr. Yale about furnishing him means of support; he came to me in September, before he raised his corn, and said he was going to raise a crop of corn, and wanted me to furnish his family with supplies *during the time he was raising a crop;* as he was a son-in-law of Brown's, I supposed it would be all straight; he said if I would furnish him goods, " I can arrange about the ground"; he said it would help him out; I told him I would certainly let him have the goods, but if he raised a crop of corn, I must have my pay; he replied, " You shall have the first money that comes out of the corn." While I was furnishing these provisions to Brown's son-in-law, I spoke to Brown about it; he did not say he would pay me, but he did say " you shall have your money." I furnished these supplies to Yale in good faith on that crop of corn he was raising. I had another talk with Yale after the one last named, and he told me he would pay me as soon as he gathered the corn crop.

McCallister testified on behalf of appellee as follows: " Mr. Yale has gone to Dakota. I had some conversation with Mr. Brown while Yale was raising his crop of corn. Brown said he wanted Yale to farm his land. It was good fertile land, and wanted him to raise a crop, and Thomas had kindly promised to furnish Yale supplies for his family, the land being good. He thought Yale could pay Thomas and some other debts; that he would pay Thomas if any one; was to pay Thomas out of his crops. I think Mr. Brown told me this in the spring of 1882, before the crop was planted."

Newkirk testified on behalf of appellee as follows: " I am acquainted with Brown. I had a talk with him about his

son-in-law running his place. He said it gave his son-in-law employment, and that Mr. Thomas had agreed to carry him during the time he was raising his crop and take his pay out of the corn and that Thomas was a good man to offer to help him, and if he could not pay him, he would. I think this conversation was in the fall of 1881, about the time of fall plowing, long before any crop was planted."

According to this testimony appellee seems to have had two reasons for giving credit to Yale; first, the fact that he was Brown's son-in-law. Secondly, that Yale promised he should have his pay out of the first money that should come out of the corn. There was no contract whatever that he should have a lien upon or any interest in the corn. It was a simple giving of credit upon his prospects of raising a crop, such as many farmers in straitened circumstances are obliged to ask for and receive. Appellee knew, and so did Brown, that Yale had nothing to pay with unless he should succeed in raising a crop. This agreement for credit was made before Brown had leased the land to Yale. But the crop could not be raised without money to pay the necessary expenses of carrying on the farm. This, Brown agreed to and did furnish. We see no reason why he could not secure himself for such money by provision in the lease, if made in good faith, or even if not secured by the lease, why he could not be secured by pledge or mortgage subsequently made. His language used to appellee can amount to no more than an assurance or a verbal guaranty that appellee should be paid, but they certainly did not mean that Brown had no right to purchase the corn, or to take a mortgage upon it, or receive it in pledge as security for money advanced to pay the expenses of raising it. The terms of the arrangement as testified to by appellee are not that he should have a lien upon the crop, but that he should be paid out of the first money received for it. This plainly implies that Yale was to be at liberty to sell the corn and pay appellee out of the proceeds. This certainly did not deprive Brown of the right to secure payment of *his* advances, if by the use of greater diligence he could procure

the first lien.   The elements of an estoppel *in pais* are wholly wanting.

The court also gave the following instruction for appellee:

Second.   The court instructs the jury, that "if you believe from the preponderance of the evidence, that there was an understanding and agreement between the defendant, Brown, and his son-in-law, Yale, that Yale should raise a crop of corn on the land of Brown in the year 1882, and that Yale was to get his provisions for his family from the plaintiff while the crop was being raised, and that he was to be paid for such provisions out of the crop raised by Yale, and that Yale so informed the plaintiff, and that the plaintiff, relying thereon, advanced to Yale the provisions for himself and family during the raising of the crop; and that after the crop was raised, said Yale, in pursuance of such agreement, sold to the plaintiff, by written bill of sale, the crop in controversy, and then delivered the same to the plaintiff, with Brown's consent, in payment of such indebtedness; and if you further believe that Brown afterward placed a chattel mortgage in the hands of the defendant, Caruthers, with instructions that said Caruthers should take possession of such corn and sell the same, and that defendant, Caruthers, did take possession of said corn, under said mortgage, and advertise the same for sale, and that thereupon plaintiff brought this suit, then you should find the issues herein for the plaintiff."

This instruction is faulty in that it is uncertain whether it means that Yale should have delivered the corn itself or only the bill of sale to appellee, with the consent of Brown.   We fail to see any evidence to support it in either view.   The corn certainly never was delivered to appellee, for it was in possession of Brown, on his own farm and in his own crib, from the time it was gathered until the suing out of the writ of replevin in this case.   Nor is there any evidence that Brown ever consented to Yale's executing and delivering the bill of sale to appellee in payment of the debt, but on the contrary, the testimony shows that Brown never knew anything about the bill of sale until a short time before the commencement of this suit.   The instruction also wholly ignores the question

as to whether or not Brown had received possession of the corn in pledge for the payment of his claim.

The court also gave the following instruction for appellee: "The court instructs the jury that the contract offered in evidence by the plaintiff, as between Yale and Thomas, would be sufficient to pass the title of the corn in controversy to Thomas, and no other or further delivery would be necessary to pass the title of David B. Yale in the corn to Isaiah Thomas; but such contract of sale without delivery of the possession of the corn would not be valid and sufficient as against subsequent purchasers." The plain inference to be drawn from this instruction is, that although there may have been no delivery of the corn, yet, as to all persons except subsequent purchasers the title would pass. If Brown was at the time of the execution of the bill of sale to Thomas in possession of the corn by virtue of a valid pledge or under a chattel mortgage, although it had neither been acknowledged nor recorded, and continued in such possession after the making of said bill of sale, he could not be regarded as a subsequent purchaser, and yet his lien would be protected by his possession. This instruction, therefore, fails to make a proper exception as to appellant, if he occupied either of the positions indicated. It was therefore misleading, and ought not to have been given.

For these reasons the judgment of the circuit court will be reversed and the cause remanded.

Reversed and remanded.